James C. Sturdevant, State Bar No. 94551
(jsturdevant@sturdevantlaw.com)
Mark T. Johnson, State Bar No. 76904
(mjohnson@sturdevantlaw.com)
Monique Olivier, State Bar No. 190385
(molivier@sturdevantlaw.com)
THE STURDEVANT LAW FIRM
A Professional Corporation
475 Sansome Street, Suite 1750
San Francisco, CA  94111
Telephone: (415) 477-2410
Facsimile: (415) 477-2420

Debra Smith, State Bar No. 147863
(dsmith@equalrights.org)
Noreen Farrell, State Bar No. 191600
(nfarrell@equalrights.org)
EQUAL RIGHTS ADVOCATES
1663 Mission Street, Suite 250
San Francisco, CA  94103
Telephone: (415) 621-0672
Facsimile: (415) 621-6744

Kristen Galles, State Bar No. 148740
(kgalles@abanet.org)
EQUITY LEGAL
10 Rosecrest Avenue
Alexandria, VA  22301
Telephone: (703) 683-4491

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### [Sacramento Division]

| | |
|---|---|
| KELSEY BRUST, et al.,<br><br>        **Plaintiff,**<br><br>vs.<br><br>**REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,**<br><br>        **Defendants** | **CASE NO. 2:07-CV-01488-FCD-EFB**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTION**<br><br>Date:          December 14, 2007<br>Time:          10:00 a.m.<br>Courtroom:   2<br><br>Honorable Frank C. Damrell |

**TABLE OF CONTENTS**

I.     INTRODUCTION................................................................................................1

II.    FACTUAL SUMMARY .......................................................................................2

III.   ARGUMENT ......................................................................................................4

    A.     Standard for a Motion to Dismiss Is a High Standard,
       Particularly in Civil Rights Cases, Which Defendants
       Cannot Overcome ......................................................................4

    B.     Plaintiffs Have Properly Pled that UCD Is Violating Title IX .........................4

       1.     The Mandate of Title IX ...................................................4

       2.     Plaintiffs Have Properly Pled that Defendants
          Ineffectively Accommodate the Interests and
          Abilities of Women Students ...........................................6

       3.     Plaintiffs "Claim" for Unequal Financial Aid
          Cannot Fail Because Such a Claim is Not Plead...................11

    C.     Plaintiffs Have Properly Pled a Claim for Violation of the
       Equal Protection Clause of the U.S. Constitution................................11

    D.     The Individual Defendants Are Not Entitled to Qualified
       Immunity from Plaintiffs' § 1983 Claim for Violation of
       Their Constitutional Right to Equal Protection. ................................17

    E.     The Individual Defendants Are Not Entitled to Discretionary Immunity .........19

    F.     Plaintiffs Have Properly Pled a Violation of California Public Policy.............21

IV.    CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ASW v. Oregon*,
    424 F.3d 970 (9th Cir. 2005) ...............................................................................13

*Act Up!/Portland v. Bagley*,
    988 F.2d 868 (9th Cir. 1993) ...............................................................................17

*Bell Atlantic Corp. v. Twombly*
    127 S. Ct. 1955 (2007)..........................................................................................4

*Branch v. Smith*,
    538 U.S. 254 (2003)............................................................................................13

*C.N. v. Wolf*,
    410 F. Supp. 2d 894 (C.D. Cal. 2005) ...................................................18, 21, 23

*Cannon v. University of Chicago*,
    441 U.S. 677 (1979).........................................................................................5, 16

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005).......................................................................................12, 13

*Clark v. Arizona Interscholastic Association*,
    695 F.2d 1126 (9th Cir. 1982) .............................................................................18

*Cohen v. Brown University*,
    809 F. Supp. 978 (D.R.I. 1992) ("*Cohen I*")........................................................9

*Cohen v. Brown University*,
    991 F.2d 888 (1st Cir. 1993) ("*Cohen II*")..........................................................17

*Communities for Equity v. Michigan High School Athletic Association*,
    127 S. Ct. 1912 (2007)........................................................................................14

*Communities for Equity v. Michigan High School Athletic Association*,
    459 F.3d 676 (6th Cir. 2006),
    *cert. denied*, 127 S. Ct. 1912 (2007) ("*CFE II*") ........................................14, 15

*Communities for Equity v. Michigan High School Athletic Association, Inc.*,
    377 F.3d 504 (6th Cir. 2004),
    *vacated*, 544 U.S. 1012 (2005) ("*CFE I*") ........................................................14

*Craig v. Boren*,
    429 U.S. 190 (1976)......................................................................................16, 18

*Crawford v. Davis*,
    109 F.3d 1281 (8th Cir. 1997) .............................................................................14

*Cruz v. Beto*,
    405 U.S. 319 (1972)..............................................................................................4

*Favia v. Ind. University of Pennsylvania.*,
    812 F. Supp. 578 (W.D. Pa. 1993)....................................................................5, 9

ii

*Franklin v. Gwinnett County Public Schools*,
        503 U.S. 60 (1992)................................................................................................16

*Gebser v. Lago Vista Independent School District*,
        524 U.S. 274 (1998)..............................................................................................17

*Harlow v. Fitzgerald*,
        457 U.S. 800 (1982)..................................................................................16, 17, 18

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
        12 F. Supp. 2d 1035 (C.D. Cal. 1998) ....................................................................4

*J.E.B. v. Alabama ex rel. T.B.*,
        511 U.S. 127 (1994)..............................................................................................18

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*,
        534 U.S. 124 (2001)..............................................................................................13

*Johns-Manville Sales Corp. v. United States*,
        622 F. Supp. 443 (N.D. Cal. 1985) ......................................................................22

*LSO Ltd. v. Stroh*,
        205 F.3d 1146 (9th Cir. 2000) ........................................................................17, 18

*Lee v. City of Los Angeles*,
        250 F.3d 668 (9th Cir. 2001) ..................................................................................4

*Lillard v. Shelby County Board of Education*,
        76 F.3d 716 (6th Cir. 1996) ..................................................................................14

*Lipsett v. University of Puerto Rico*,
        864 F.2d 881 (1st Cir. 1988)..................................................................................16

*McQuirk v. Donnelley*,
        189 F.3d 793 (9th Cir. 1999) ................................................................................21

*Middlesex County Sewerage Authority v. National Sea Clammers Association*,
        453 U.S. 1 (1981)..................................................................................................12

*Mississippi University for Women v. Hogan*,
        458 U.S. 718 (1982)..............................................................................................16

*Neal v. Board of Trustees of Cal. State University*,
        No. CV-F-97-5009-REC-SMS,
        1997 WL 1524813 (E.D. Cal. Dec. 26, 1997) .................................................6, 10

*Pederson v. Louisiana State University*,
        213 F.3d 858 (5th Cir. 2000) ................................................................................10

*Retail Clerks International Association v. Schermerhorn*,
        373 U.S. 746 (1963)................................................................................................4

*Roberts v. Colorado State Board of Agriculture*,
        998 F.2d 824 (10th Cir. 1993) ............................................................................5, 9

iii

*Seamons v. Snow,*
    84 F.3d 1226 (10th Cir. 1996) ...................................................................................14

*Shechter v. Comptroller of City of New York*,
    79 F.3d 265 (2nd Cir. 1996)..........................................................................................4

*Smith v. Robinson,*
    468 U.S. 992 (1984)..............................................................................................12, 15

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)........................................................................................................4

*Thorsted v. Kelly,*
    858 F.2d 571 (9th Cir. 1988) ......................................................................................19

*Todd v. U.S.,*
    849 F.2d 365 (9th Cir. 1988) ......................................................................................19

*United States v. Virginia,*
    518 U.S. 515 (1996)......................................................................................................18

*Watson v. Weeks,*
    436 F.3d 1152 (9th Cir.), *cert. denied sub nom.*,
    *Goldberg v. Watson*, 127 S. Ct. 598 (2006) ...........................................................13

*Weiker v. Mesa County Valley School District #51,*
    No. CIVA05CV806-WYD-CBS,
    2007 WL 595629 (D. Colo. Feb 21, 2007) ...........................................................9, 11

*Wilder v. Virginia Hospital Association*,
    496 U.S. 498 (1990)......................................................................................................17

*Wright v. City of Roanoke Redevelopment & Housing Authority,*
    479 U.S. 418 (1979).....................................................................................................17

**STATE CASES**

*Barner v. Leeds,*
    24 Cal. 4th 676 (2000) ...........................................................................................20, 21

*Caldwell v. Montoya,*
    10 Cal. 4th 972 (1995) ...........................................................................................20, 21

*Green v. Ralee Engineering Co.,*
    19 Cal. 4th 66 (1998) .....................................................................................................21

*Hudson v. Craft,*
    33 Cal. 2d 654 (1949) .....................................................................................................23

*Johnson v. State,*
    69 Cal. 2d 782 (1968) ..............................................................................................19, 20

*Lipman v. Brisbane Elementary School District,*
    55 Cal. 2d 224 (1961) .....................................................................................................21

iv

*Lopez v. Southern California Rapid Transit District,*
    40 Cal. 3d 780 (1985) ........................................................................................................19

*Neary v. Regents of the University of Cal.,*
    185 Cal. App. 3d 1136 (1986) ...........................................................................................21

*Reynolds v. Bement,*
    36 Cal. 4th 1075 (2005) ...............................................................................................23, 24

*Rojo v. Kliger,*
    52 Cal. 3d 65 (1990) ..........................................................................................................22

*Stevenson v. Superior Court,*
    16 Cal. 4th 880 (1997) ......................................................................................................22

*Taylor v. City of Los Angeles Department of Water & Power,*
    144 Cal. App. 4th 1216 (2006) .........................................................................................20

*Thornburg v. Superior Court,*
    138 Cal. App. 4th 43 (2006) .............................................................................................24

### DOCKETED

*Mansourian v. Board of Regents of the Univ. of Cal.*
    (E.D. Cal., No. 2:03-CV-02591-FCD-EFB) .......................................................................3

### FEDERAL STATUTES

20 U.S.C.
    § 1415(f)..........................................................................................................................12
    § 1681(a) ............................................................................................................................5

42 U.S.C.
    § 1983................................................................................................................... passim

34 C.F.R.
    § 106.3(a) ...........................................................................................................................5
    § 106.41(c)..........................................................................................................................8
    § 106.41(c)(1).....................................................................................................................8
    § 106.41(d)..........................................................................................................................8
    § 106.71.............................................................................................................................16

Title IX: A Policy Interpretation, 44 Fed. Reg.
    71,413, *et seq* ....................................................................................................................5
    71,418...........................................................................................................................6, 10

### STATE STATUTES

Cal. Educ. Code
    § 220 *et seq.* .....................................................................................................................23
    § 262.4..............................................................................................................................23

1

## OTHER AUTHORITIES

2

*Discrimination Against Women:  Hearings Before the Special*
  *Subcomm. on Educ. of the House Comm. on Educ. and Labor*
3
  *on § 805 of H.R. 16098*, 91st Cong., 2d Sess. (1970); 118 Cong. Rec. 5804 (1972) ......................5

4  H.R. Rep. No. 99-296 (1985).............................................................................................................12

5  U.S. Dep't of Educ., Office for Civil Rights, *Clarification of Intercollegiate*
  *Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996),
6
  *available at* http://www.ed.gov/about/offices/list/ocr/docs/clarific.html
  ("OCR 1996 Clarification")................................................................................................8, 9, 10
7

8  Valerie M. Bonnette & Lamar Daniel, *Title IX Athletics Investigator's Manual*
  *1990* (U.S. Dept. of Educ., Office for Civil Rights, Apr. 2 1990)...................................................8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.  INTRODUCTION**

2       Plaintiffs Kelsey Brust, Laura Ludwig, and Jessica Bulala have brought this complaint against

3  the Regents of the University of California ("Regents") and two of the officials at the University of

4  California at Davis ("UCD") for refusing to provide equal opportunity to women in UCD's athletic

5  program.  UCD promotes itself as a bastion for women athletes and yet, thirty-five years after Title IX

6  was enacted, UCD continues to favor men over women in athletics, and as a result continues to deprive

7  women students of equal opportunity in their education.

8       Defendants move to dismiss the complaint on various grounds.  Plaintiffs concede that the

9  Regents are immune from Plaintiffs' state law claims and claim for punitive damages.  The rest of

10  Plaintiffs' complaint, however, is properly pled, and Defendants' motion on all other grounds must be

11  denied.

12       First, Defendants' argument that this Court should find as a matter of law that UCD is in

13  compliance with Prong 1 of the Office of Civil Rights' ("OCR") three-pronged test for evaluating a Title

14  IX  ineffective accommodation claim is not well taken.  The 6% disparity between female athletic

15  participants and enrollment alleged in the complaint is based on UCD's numbers alone.  The actual

16  disparity is a factual matter that must be developed, and cannot be resolved on the pleadings.  Moreover,

17  even if UCD's 6% disparity were true, it is not substantially proportionate.  The law is clear that

18  something at or near actual proportionality is required.  Defendants concede that not a single case has

19  held that *any* differential is sufficient to satisfy Prong 1 as a matter of law.  Defendants' effort to

20  extrapolate a permissible percentage from cases identifying what is an impermissible percentage is

21  unavailing.  Thus, Plaintiffs' allegation that Defendants have not satisfied Prong 1 (or any other prong of

22  the test) is sufficient to survive Defendants' motion.

23       Second, Defendants' argument that Plaintiffs' Title IX claim for unequal financial assistance

24  must be dismissed reveals a misreading of the complaint.  Plaintiffs' allegation that UCD fails to provide

25  equal financial assistance is simply a factual allegation that supports their unequal accommodation

26  claim.  Plaintiffs do not plead a separate claim for relief for unequal financial assistance, so there is

27  nothing subject to dismissal.

28       Third, Plaintiffs have properly pled that the Regents and the individual defendants, UCD

1

1  Chancellor Larry Vanderhoef and UCD Athletic Director Greg Warzecka, have violated the Equal

2  Protection Clause by discriminating against them and other women students at UCD.  This equal

3  protection claim is distinct from Plaintiffs' Title IX claim against the Regents.  Defendants have failed

4  to meet their heavy burden of demonstrating that Congress intended Title IX to preclude Plaintiffs'

5  pursuit of their constitutional claims, which lies against different Defendants for violation of different

6  rights and provides different remedies.  Plaintiffs' equal protection claim is not subsumed by Title IX.

7        Fourth, Defendants have failed to demonstrate that Defendants Vanderhoef and Warzecka are

8  immune from any of Plaintiffs' claims.  They are not entitled to qualified immunity because Plaintiffs

9  properly allege that Defendants' discrimination against them unreasonably violates their fundamental

10  and constitutional right to equal protection of the law.  They are not entitled to discretionary immunity

11  because, as Plaintiffs allege in the complaint, Defendants were acting in furtherance of UCD's policy of

12  refusing to provide equal athletic opportunities to women.

13        Accordingly, the Court should deny Defendants' Motion to Dismiss.

14  **II.    FACTUAL SUMMARY**

15        UCD has an ongoing practice of providing its male students with greater athletic opportunities

16  than its female students, despite the significant interest and ability of its female students.  While UCD

17  touts itself as a leader in athletics for women, it has continually failed to provide women with equal

18  opportunity to participate in varsity athletics, it has a history of failing to expand the athletic

19  opportunities available for women, and it disregards the interest and ability in athletics of its current

20  female students.  (Compl. ¶¶ 22-25.)

21        The percentage of women enrolled at UCD continues to increase, yet, UCD has not

22  proportionally expanded the opportunities available to women in athletics.  (Compl. ¶ 24.)  In fact,

23  although several women's sports club teams, including field hockey and rugby, have demonstrated their

24  interest in obtaining varsity status, UCD has denied the varsity applications of at least five registered

25  sports clubs.  (*Id.* ¶ 25.)  In contrast to their assertions that they have expanded opportunities, UCD has

26  actually decreased the athletic opportunities for women by eliminating sports, such as field hockey and

27  wrestling.  (*Id.* ¶¶ 24-25.)  Additionally, UCD uses different criteria in its treatment of its men's teams,

28  for example, it relies to a greater extent, in the case of men, on recruiting athletes from various sources

1   to determine which teams to establish and maintain.  (*Id.* ¶ 23.)

2       Plaintiffs Brust and Bulala are active participants in and highly skilled members of UCD' club

3   field hockey team.  (Compl. ¶¶ 11(a) & (b).)  Both have been involved with field hockey since

4   childhood and have a strong interest in varsity opportunities.  (*Id.*)  Plaintiff Ludwig wrestled throughout

5   high school and has played rugby at UCD.  (*Id.* ¶ 11(c).)  She wanted to wrestle at UCD, but was unable

6   to do so because UCD eliminated women's varsity wrestling.  (*Id.*)  She has played on the UCD rugby

7   club team and has an interesting in participating in varsity sports at UCD.  (*Id.*)

8       As a result of Defendants' failure to provide equal opportunities for women athletes, or to

9   continuously expand the opportunities it provides for women, Plaintiffs have been denied the chance to

10  play varsity sports.  Plaintiffs also have been denied varsity sport benefits such as health insurance,

11  financial scholarships, and preferential class scheduling.  (*Id.* ¶ 25(b).)

12      The Regents of the University of California are charged with overseeing the administration and

13  operation of UCD, including its athletic program.  (Compl. ¶¶ 12 & 18.)  The individual Defendants,

14  Larry Vanderhoef and Greg Warzecka, are responsible for the day-to-day administration of UCD and its

15  athletic program.  (*Id.* ¶¶ 15-17.)  They are also the individuals responsible for managing and ensuring

16  non-discrimination in the athletic program.  (*Id.*)

17      The complaint was filed on July 24, 2007 and asserts four claims for relief:  (1) violation of Title

18  IX for failure to provide equal athletic opportunities to women; (2) violation of 42 U.S.C. section 1983

19  based on the equal protection clause of the U.S. Constitution; (3) violation of the California Unruh Civil

20  Rights Act; and (4) violation of public policy based upon the California Constitution and the California

21  Education Code.  (Docket # 1.)  Defendants filed their Rule 12(b)(6) motion on October 26, 2007.

22  (Docket # 20-26.)

23      A related case, *Mansourian v. Board of Regents of the Univ. of Cal.* (E.D. Cal., No. 2:03-CV-

24  02591-FCD-EFB), was filed on December 18, 2003.  The *Mansourian* action alleges identical violations

25  of the law as are alleged in this case, that UCD has failed to provide equal athletic opportunities to

26  women in violation of Title IX.  Initially, *Mansourian* was a putative class action, but after Plaintiffs

27  were denied leave to amend the complaint, they voluntarily dismissed the class allegations of the

28  complaint.  Discovery in the *Mansourian* matter closes on December 28, 2007 and the case is scheduled

1   for trial on June 17, 2008.

2   **III. ARGUMENT**

3       **A.    Standard for a Motion to Dismiss Is a High Standard, Particularly in Civil Rights Cases, Which Defendants Cannot Overcome.**

4

5       A court "may dismiss a complaint only if it is clear that no relief could be granted under any set

6   of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S.

7   506, 514 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  The allegations of the

8   complaint must be accepted as true.  *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  The court must give a

9   plaintiff the benefit of every reasonable inference to be drawn from the well-pleaded allegations of the

10  complaint.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  Thus, the plaintiff

11  need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly

12  alleged.  *See id.*

13      The court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a

14  claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974

15  (2007).  Only where a plaintiff has "nudged [the] claims across the line from conceivable to plausible,"

16  is the complaint properly dismissed.  *Id.*  The high standard on a motion to dismiss is applied with

17  "particular strictness" in civil rights cases.  *Shechter v. Comptroller of City of New York,* 79 F.3d 265,

18  270 (2nd Cir. 1996).

19      In addition, the court may only consider the facts stated within the four corners of the complaint.

20  The court may not examine any external facts, unless they are facts that are subject to judicial notice

21  under Federal Rules of Evidence, rule 201.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.

22  2001); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

23      **B.    Plaintiffs Have Properly Pled that UCD Is Violating Title IX.**

24          **1.    The Mandate of Title IX.**

25      Congress enacted Title IX in 1972 to prohibit gender discrimination by educational institutions

26  which receive federal financial assistance.  Title IX reads in pertinent part:

27          No person in the United States shall, on the basis of sex, be excluded from participation in, be
            denied the benefits of, or be subjected to discrimination under any education program or activity
28          receiving federal financial assistance, . . .

                                                    4

20 U.S.C. § 1681(a).  As the extensive legislative history of Title IX makes clear, Congress intended Title IX to operate as a broad remedial measure that would combat well-documented sex discrimination in educational institutions, including athletic programs.  *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 683 (1979).  Congress continuously rejected attempts to exclude or limit Title IX's reach with respect to intercollegiate athletics, focusing on Title IX's critical role in addressing the pervasive problems of sex discrimination in intercollegiate athletics.  *See, e.g., Discrimination Against Women:  Hearings Before the Special Subcomm. on Educ. of the House Comm. on Educ. and Labor on § 805 of H.R. 16098*, 91st Cong., 2d Sess. (1970); 118 Cong. Rec. 5804 (1972) (Title IX was intended to be "a strong and comprehensive measure … [that would] provide women with solid legal protection from the persistent, pernicious discrimination which is serving to perpetuate second-class citizenship for American women").

The regulations promulgated pursuant to Title IX require educational institutions receiving federal funds to "**provide equal athletic opportunity for members of both sexes**."  34 C.F.R. § 106.41(c) (emphasis added).  The regulations offer a non-exclusive list of ten factors which should be considered in assessing compliance.  The Regulations require schools take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX.  34 C.F.R. § 106.3(a).  The Regulations further require that sponsors of intercollegiate athletics programs comply with the Regulations within three years of their effective date, which was July 21, 1975.  34 C.F.R. § 106.41(d).

The critical factor in this case is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes."  34 C.F.R. § 106.41(c)(1).  It is well-established that "an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes."  *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993) (citations omitted); *Cohen v. Brown Univ.*, 991 F.2d 888, 897-98 (1st Cir. 1993) ("*Cohen II*"); *Favia v. Ind. Univ. of Pa.*, 812 F. Supp. 578, 584-85 (W.D. Pa. 1993).

In 1979, the Office of Civil Rights (OCR) issued a Policy Interpretation to provide further guidance on the meaning of equal athletic opportunity.  Title IX: A Policy Interpretation, 44 Fed. Reg. 71,413, *et seq.* (1979) (the "Policy Interpretation").  The Policy Interpretation essentially separates Title

5

IX athletics claims into three categories: (1) ineffective accommodation (i.e., failure to provide enough participation opportunities); (2) athletic financial assistance; and (3) equal treatment and benefits for existing teams and athletes. This case is about ineffective accommodation – a demand for more women's sports teams to accommodate the long-existing yet long-unmet interests and abilities of UCD women students.

The Policy Interpretation sets forth a three-pronged test:

In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.

a. Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. at 71,418. Courts look at the three prong test as a whole. "Put another way, Part (1) provides that if institutions have not distributed athletic opportunities in numbers 'substantially proportionate' to the gender composition of their student bodies, they have presumptively violated Title IX. The rest of the test recognizes that there are circumstances under which, as a practical matter, something short of substantial proportionality will suffice to rebut the presumption that Title IX has been violated." *Neal v. Bd. of Trustees of Cal. State Univ.*, No. CV-F-97-5009-REC-SMS, 1997 WL 1524813, *9 (E.D. Cal. Dec. 26, 1997).

## 2. Plaintiffs Have Properly Pled that Defendants Ineffectively Accommodate the Interests and Abilities of Women Students.

Defendants ask the Court to rule as a matter of law that (1) UCD's disparity between male and female participation in relation to their enrollment numbers is 6%; and (2) a 6% disparity is *close*

6

*enough* to substantial proportionality to find that Defendants are complying with Title IX.  Defendants are incorrect on both counts.

First, the actual disparity between men and women athletes is inherently a matter of fact.  There is no agreement between the parties as to what those numbers are.  As Plaintiffs allege, the 6% disparity is based on UCD's own numbers.  Plaintiffs specifically allege:

22.    According to the most recent publicly available report that UC Davis has filed with the United States Department of Education pursuant to the Equity in Athletics Disclosure Act, 20 U.S.C. section 1092, during the 2005-2006 academic year, women comprised approximately 56% percent of the student population. However, women comprised only 50% percent of the participants on the intercollegiate varsity teams offered by UC Davis.  Upon information and belief, the disparity between the rate of participation in intercollegiate athletics among women and women's enrollment is approximately the same today.

23.    UC Davis has a practice of providing its male students with greater athletic opportunities which has continued over time.  As alleged above, UC Davis does not offer female students opportunities to participate in intercollegiate athletics substantially proportionate to the percentage of women enrolled as students.  On information and belief, UC Davis has established and maintained its men's intercollegiate athletic teams based upon different criteria than women's teams, relying to a greater extent, in the case of men, on recruiting athletes from various sources to determine which teams to establish and maintain.

24.    UC Davis does not have a history or continuing practice of expanding intercollegiate athletic opportunities for women students to accommodate their existing or developing interests.  For example, at various periods of time since the passage of Title IX, female participation opportunities for women have actually decreased even though the number of female students has steadily risen over the years.  In addition, UC Davis has eliminated women's varsity teams, including field hockey and wrestling.

25.    UC Davis has not fully and effectively satisfied the interest of women students in intercollegiate varsity athletic opportunities.

(Compl. ¶¶ 22-25.)  Plaintiffs also allege that there are approximately 12,000 women athletes at UCD.  (Compl. ¶ 21.)

As the case proceeds, Plaintiffs may discover that the disparity is in fact larger than 6% due to a variety of factors, including how UCD counts and reports its women athletes.  Plaintiffs do not accept the 6% disparity as true; they allege it as evidence that even according to UCD's own numbers, it continues to deny women athletes a significant number of participation opportunities.  Thus, there is no opportunity for the Court to decide as a matter of law that 6% could satisfy Prong 1.

Second, even if Defendants numbers were accurate, a 6% disparity in an athletic program as

7

1  large as UCD's is not "substantially proportionate."  Even under UCD's numbers, more than 80 women

2  are denied equal athletic opportunity – a number large enough to field at least three new varsity teams.

3  As the Regulations, Policy Interpretation and case law make clear, substantial proportionality

4  contemplates something at or very near actual proportionality.  Indeed, the OCR's 1996 Clarification of

5  the Policy Interpretation dictates that an institution's numbers are not substantially proportionate unless

6  and until the disparity is less than the number of athletes required to field a new team.  U.S. Dep't of

7  Educ., Office for Civil Rights, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-*

8  *Part Test* (Jan. 16, 1996), *available at* http://www.ed.gov/about/offices/list/ocr/docs/clarific.html ("OCR

9  1996 Clarification").  Because UCD is far from actual proportionality, it cannot avail itself of Prong 1 at

10  all and instead will have to defend this case by arguing that it is in compliance with Prongs 2 or 3.

11  Defendants offer no authority to support their contention that compliance with Title IX through

12  Prong 1 can be met with something *less than* actual proportionality.  All law is, in fact, to the contrary.

13  The regulations explicitly and unequivocally require schools to provide "*equal* athletic opportunity."  34

14  C.F.R. § 106.41(c) (emphasis added).  The OCR, the agency charged with administering Title IX, has

15  repeatedly emphasized that it contemplates something at or very near actual proportionality to satisfy

16  Prong 1.  The OCR has instructed its Title IX compliance investigators that actual proportionality is the

17  goal.  The *Investigator's Manual* states: "if the enrollment is 52% male and 48% female, then, ideally,

18  about 52% of the participants in the athletics program should be male and 48% female . . . ."  Valerie M.

19  Bonnette & Lamar Daniel, *Title IX Athletics Investigator's Manual 1990* (U.S. Dept. of Educ., Office

20  for Civil Rights, Apr. 2 1990), at 24.  The manual also states "[t]here is no set ratio that constitutes

21  'substantially proportionate'."  *Id.*

22  The OCR's 1996 Clarification explains that actual proportionality is expected except in rare

23  circumstances to account for such occurrences as "natural fluctuations in enrollment and participation

24  rates or because it would be unreasonable to expect an institution to add athletic opportunities in light of

25  the small number of students that would have to be accommodated to achieve exact proportionality."

26  The acceptable exceptions to actual proportionality noted by the OCR as examples include a 2%

27  deficiency as a result of a 2% increase in women's enrollment the year following exact proportionality,

28  and a 5% and 6 athlete deficiency in a program of only 60 athletes, where adding 6 athletes would *not* be

8

enough to field a team.  OCR 1996 Clarification.

Tellingly, the example given by the OCR of a university that is not in compliance with Prong 1 is an even less egregious situation than that alleged by Plaintiffs:

> For instance, Institution A is a university with a total of 600 athletes.  While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes.  If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate.  Because this is a significant number of unaccommodated women, it is likely that a viable sport could be added.  If so, Institution A has not met part one.

OCR 1996 Clarification.  Here, Plaintiffs allege that approximately 12,000 women make up 56% of UCD's enrollment, but represent only 50% of its athletes.  If UCD provided women with 56% of athletic opportunities, approximately 80 additional women would be able to participate.  (*See* Compl. ¶¶ 21-22.) Defendants' argument that a 6% deficiency under these facts in 2007 is *close enough* for Title IX compliance is unsupportable.

Not surprisingly, no court has ever held that *any* disparity between female enrollment and athletic participation satisfies the substantial proportionality requirement of Prong 1.  All published cases hold that a lack of proportionality means that an institution may not use Prong 1 to establish Title IX compliance.  *See, e.g., Roberts*, 998 F.2d at 829-30; *Weiker v. Mesa County Valley School Dist. #51*, No. CIVA05CV806-WYD-CBS, 2007 WL 595629, at *5 (D. Colo. Feb 21, 2007); *Cohen v. Brown Univ.,* 809 F. Supp. 978, 991 (D.R.I. 1992) ("*Cohen I*"); *Favia*, 812 F. Supp. at 585.

Defendants' attempt to distinguish these cases on the basis that the disparities are greater than that alleged here is entirely unconvincing.  (Def's MPA at 6:19-20.)  The courts in the *Roberts* and *Weiker* cases, for example, found that "substantial proportionality entails a fairly close relationship between athletic participation and undergraduate enrollment."  *Roberts*, 998 F.2d at 830 (footnote omitted); *see also Weiker,* 2007 WL 595629, at *5.[1]  This makes perfect sense.  Prong I is *not,* as Defendants insist, a way for universities to avoid reaching actual proportionality more than three

---

[1]    Defendants' attempted reliance on a settlement is even more far afield.  Aside from being improperly before the Court (see Pltfs' Opp. to Defs' RJN, filed concurrently herewith) the settlement terms mandated that the defendant school increase its proportionality of women athletes to women enrolled to within 5%.  The settlement is not, obviously, a judicial determination that 5% is the magic number to achieve "substantial proportionality."  Moreover, the 5% is still *greater* proportionality than that alleged here.

9

1  decades after Congress called upon them to cease their widespread discrimination against women.  As

2  courts have noted, Prong 1 merely allows a rebuttable presumption of a Title IX violation to be created.

3  Indeed, as one court stated, "the Policy Interpretation never states that a school is automatically in

4  *compliance* with Title IX just because it has achieved a statistical balance."  *Neal,* 1997 WL 1524813, at

5  *13 (emphasis in original).  It is plain, at a minimum, that an institution cannot claim automatic

6  compliance with Title IX when it has a statistical *imbalance*.

7  Prong 1 was never intended as a sword to argue that something less than actual equivalency is, as

8  a matter of law, compliance with Title IX.  To the contrary, because the ratio of women to men athletes

9  is *not* substantially proportionate to the ratio of women to men students, Defendants cannot seek safety

10  in Prong 1 and must instead – to avoid liability under Title IX – demonstrate that UCD has either a

11  history of continued practice of program expansion that is demonstrably responsive to the interests and

12  abilities of women athletes or that the interests and abilities of the members of that sex have been fully

13  and effectively accommodated by its athletic program.  Policy Interpretation, 44 Fed. Reg. at 71,418.  As

14  Plaintiffs will prove, Defendants can show neither.

15  In any event, these are clearly not issues to be resolved at the pleadings stage.  Even if "equal

16  opportunity" could be legally construed as something *less* than actual proportionality, this necessarily

17  requires a factually intensive inquiry.  As Plaintiffs allege, the 6% disparity is based on UCD's own

18  numbers – Plaintiffs may well be able to offer evidence that the disparity is in fact greater and will have

19  to put the disparity in the context of the overall enrollment numbers and athletic program numbers and

20  history of those numbers.  As the OCR examples above make plain, there are facts regarding the size of

21  UCD's enrolled population and the size of its athletic program that must be established, as the disparity

22  as measured by the percentage relative to the student body alone is not, in and of itself, necessarily

23  dispositive.  *See* OCR 1996 Clarification.  It is therefore evident that a factual record must be developed

24  before Plaintiffs know exactly what the current disparity is at UCD.  *See, e.g., Pederson v. Louisiana*

25  *State Univ.,* 213 F.3d 858, 878-79 (5th Cir. 2000) (finding a lack of substantial proportionality after

26  consideration of a full factual record); *Weiker*, 2007 WL 595629 at *5 (determining after thorough

27  consideration of all facts presented on summary judgment, that the disparity of 6.1% to 10.4% over a

28  three year period demonstrated the defendant high school's failure to comply with Prong I of Title IX.)

Finally, Defendants' claim that UCD has provided more opportunities for women athletes than for male athletes is of no weight. Extending this logic would lead to ridiculous results. Defendants would have this Court find, as a matter of law, that they would be complying with Title IX if they provided 1000 athletic opportunities to women and 900 to men, even if the population at the school was 3000 women and 900 men. This is clearly not the result intended by Title IX.

Defendants' claim that UCD complies with Title IX as a matter of law where it is providing at least 80 fewer athletic participation opportunities for women than for men relative to their respective enrollment must be rejected.

### 3. Plaintiffs "Claim" for Unequal Financial Aid Cannot Fail Because Such a Claim is Not Plead.

Plaintiffs' complaint includes allegations of fact regarding Defendants' failure to distribute financial assistance equally. Plaintiffs plead that UCD continues to violate Title IX by offering unequal financial resources because female students are provided with less financial assistance than to male students in proportion to their enrollment. (*See, e.g.,* Compl. ¶¶ 53, 54.) However, Plaintiffs do not allege these facts as a distinct claim, nor as an element of a claim. Plaintiffs allege the unequal financial aid distribution as a fact relevant to Defendants' discriminatory behavior in violation of Title IX. Plaintiffs are entitled to plead facts relevant to and supportive of their legal claims. Defendants' attempt to "dismiss" allegations that do not constitute a claim is improper.

### C. Plaintiffs Have Properly Pled a Claim for Violation of the Equal Protection Clause of the U.S. Constitution.

Plaintiffs assert a claim against Defendants under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the U.S. Constitution. Defendants assert that this claim is subsumed by Title IX. The Ninth Circuit has not ruled on whether an equal protection claim is subsumed by Title IX, and there is a split among the other circuits. Recent Supreme Court and Ninth Circuit authority signals, however, that equal protection claims are not subsumed by Title IX and that a claim for violation of constitutional rights under 42 U.S.C. § 1983 should be foreclosed only in the rarest of cases.

The Supreme Court has found a statutory scheme to bar enforcement of rights under § 1983 only three times. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120-21 (2005); *Smith v.*

1   *Robinson*, 468 U.S. 992, 1009-12 (1984); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*

2   *Ass'n*, 453 U.S. 1, 20-21 (1981).  In *Sea Clammers*, the Court found that the "unusually elaborate

3   enforcement provisions" of two federal environmental laws that "created so many specific statutory

4   remedies" suggested that Congress did not intend to preserve a § 1983 right of action based on the

5   federal statute (as opposed to any constitutional right).  453 U.S. at 13, 20-21.  In *Smith v. Robinson,* the

6   Supreme Court considered whether plaintiffs could assert claims under the Education of the

7   Handicapped Act ("EHA") as well as constitutional claims under section 1983.  468 U.S. at 1005.

8   Importantly, the Court noted that although plaintiffs' § 1983 claim was premised on the Constitution, the

9   Constitution does not recognize a fundamental right to a "free and appropriate" public education and

10  therefore provided no greater rights to plaintiffs than the EHA.  Because the Court thus found that

11  plaintiffs' constitutional claim was "virtually identical" to the EHA claim, it framed the issue as whether

12  "Congress intended that the EHA to be the exclusive avenue through which a plaintiff may assert those

13  claims." *Id.* at 1009.  After engaging in a thorough analysis of the EHA's provisions and legislative

14  history, it then found that plaintiffs' § 1983 claim was foreclosed because the "carefully tailored

15  administrative and judicial mechanism" set out in the EHA demonstrated Congressional intent for the

16  EHA to serve as the exclusive method by which plaintiffs could assert the right to a free appropriate

17  public education.[2]  *Id.* at 1009, 1013.

18      In *Rancho Palos Verdes,* the Supreme Court barred found the plaintiff could not rely on § 1983

19  to enforce the Telecommunications Act of 1996 ("TCA").  The plaintiff brought a claim under the TCA

20  itself for injunctive relief.  Because the TCA does not provide for monetary relief, however, the plaintiff

21  also sued under § 1983 based solely on the TCA as a way to seek damages.  The Court found that the

22  "detailed" scheme and "limited remedies" of the statute indicated an intent by Congress that the TCA be

23  the exclusive remedy such that it is incompatible with parallel enforcement under § 1983.  544 U.S. at

24  120-24; *see ASW v. Oregon*, 424 F.3d 970, 977-78 (9th Cir. 2005) (noting that the "dispositive issue" in

25  *Rancho Palos Verdes* is "whether the private remedy provided by statute is more restrictive than those

26

27  [2]   Congress promptly responded to the ruling by amending the statute to more expressly state that it
28  did not intend the EHA to displace any other remedies. 20 U.S.C. § 1415(f); *see* H.R. Rep. No. 99-296, at 4 (1985).

1  available through a § 1983 action, such that the § 1983 action would function as an end run around the

2  enforcement mechanism Congress provided" (citations omitted)).  Observing that the TCA limited relief

3  in ways that § 1983 did not, the Court concluded that enforcement of the TCA "through § 1983 would

4  distort the scheme of expedited judicial review and limited remedies created by [the TCA]."  *Id.* at 978

5  (citations and internal quotes omitted).

6          The Ninth Circuit has reviewed this jurisprudence in depth and has determined that where, as

7  here, "Plaintiffs have asserted a federal right presumptively enforceable under § 1983, the burden falls

8  on [defendants] to rebut this presumption by showing that Congress has 'specifically foreclosed a

9  remedy under § 1983' either expressly 'or impliedly, by creating a comprehensive enforcement scheme

10  that is incompatible with individual enforcement under § 1983.'"  *ASW*, 424 F.3d at 977 (citation

11  omitted); *see Rancho Palos Verdes,* 544 U.S. at 121-22.  Moreover, a court must "begin [its] analysis by

12  recognizing that we do 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a

13  remedy for the deprivation of a federally secured right.'"  *ASW*, 424 F.3d at 977 (citing *Price v. City of*

14  *Stockton*, 390 F.3d 1105, 1114 (9th Cir. 2004) (quoting *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 520

15  (1990))).[3]  Because the burden of Defendants is thus significant, the Ninth Circuit has held § 1983

16  claims viable even where they are based on a federal statute and not the Constitution.  *See, e.g., ASW,*

17  424 F.3d at 977; *Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir.), *cert. denied sub nom.*, *Goldberg v.*

18  *Watson*, 127 S. Ct. 598 (2006).

19          Against this backdrop, it is plain that Plaintiffs' § 1983 claim survives.  The circuit courts that

20  have held equal protection claims to stand separate and apart from Title IX claims are in line with

21  Supreme Court jurisprudence (and Ninth Circuit authority), while those that have found such claims to

22  be foreclosed are contrary to the Court's teachings.  *See Communities for Equity v. Mich. High School*

23  *Athletic Ass'n,* 459 F.3d 676, 684-85 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1912 (2007) (*"CFE II"*);

24  *Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir. 1997) (finding no foreclosure of claim where § 1983

25

26  [3]     As the United States Supreme Court has explained, when two federal rights can coexist, the later
27  one enacted is not to be deemed to repeal the earlier one unless there is clear congressional intent to do
    so, even though the result may be to give a plaintiff a choice of federal remedies.  *See Branch v. Smith*,
    538 U.S. 254, 273 (2003); *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141-44
28  (2001).

---

13

1  claim based on equal protection clause); *Seamons v. Snow*, 84 F.3d 1226, 1233-34 (10th Cir. 1996)

2  (plaintiff has independent rights under Title IX and under § 1983 for violations of constitutional rights);

3  *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 722-23 (6th Cir. 1996) (plaintiff's § 1983 action did

4  not purport to gain remedies unavailable under Title IX, but instead sought to enforce distinct and

5  independent substantive due process rights). [4]

6        The thorough analysis and reasoning of the Sixth Circuit in *CFE II* is particularly persuasive.

7  The Court explained that even though the federal statutes "that created the very rights that they were

8  asserting did not authorize monetary damages, the plaintiffs in *Sea Clammers* and *Rancho Palos Verdes*

9  sought such damages pursuant to § 1983. This litigation strategy was explicitly disapproved of by the

10  Supreme Court in both cases and forms the bedrock for the *Sea Clammers* principle." 459 F.3d at 684.

11  The Court contrasted that with plaintiffs' § 1983 claim, which was not being used "as a vehicle to

12  enforce the substantive federal law found in Title IX, but as a vehicle to recover for alleged violations of

13  the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 684.  The Court found this to be a

14  "critical distinction" from the reasoning of *Sea Clammers* and *Rancho Palos Verdes*, which "hinges on

15  the fact that when Congress created the particular rights through statute, it also created particular

16  remedies for those statutory violations." *Id.* (citation omitted).  A claim based on the Equal Protection

17  Clause, to the contrary, would be actionable even if Congress had never enacted Title IX.  Thus, to find

18  preclusion, a court must find that "Congress intended to *abandon* the rights and remedies set forth in

19  Fourteenth Amendment equal protection jurisprudence when it enacted Title IX in 1972." *Id.* (emphasis

20  added).

21

22    [4]     Indeed, the procedural history of the *CFE II* case is instructive.  In an earlier opinion issued in
the case, the Court of Appeals for the Sixth Circuit held that the Michigan High School Athletic
23  Association ("MHSAA") had violated the Equal Protection Clause by discriminating against women
high school athletes.  *Communities for Equity v. Mich. High School Athletic Ass'n, Inc.,* 377 F.3d 504
24  (6th Cir. 2004) ("*CFE I*"), *vacated*, 544 U.S. 1012 (2005).  MHSAA filed a petition for certiorari to the
U.S. Supreme Court, arguing that the plaintiffs' equal protection claim was foreclosed by Title IX.  The
25  U.S. Supreme Court granted the petition, and transferred the case back to the Sixth Circuit for
reconsideration in light of the *Rancho Palos Verdes* case.  The Sixth Circuit thoroughly considered the
26  issue and concluded that plaintiffs could maintain their equal protection claim.  *CFE II,* 459 F.3d at 684-
85, 690.  MHSAA petitioned the Supreme Court again, but the petition was denied.  *Communities for*
27  *Equity v. Mich. High School Athletic Ass'n,* 127 S. Ct. 1912 (2007).

28

1   Applying the Supreme Court's test in *Smith*, which did involve a constitutional claim, the Sixth

2   Circuit then found that Title IX would preclude an equal protection claim only if:  (1) the Title IX claim

3   is "virtually identical" to the constitutional claim, *and* (2) the remedies provided in Title IX indicate that

4   Congress intended to preclude reliance on § 1983.  *CFE II*, 459 F.3d at 685; *Smith*, 468 U.S. at 1009.

5   Noting that only one part of the test need be answered in the negative, the Court found that Congress did

6   not intend to preclude reliance on § 1983, finding that:  (1) the only enforcement mechanism expressly

7   authorized in Title IX is the withdrawal of federal funds, which stands in "stark contrast" to the

8   comprehensive and "carefully tailored" administrative and judicial remedies at issue in *Sea Clammers*

9   and *Smith*; (2) Title IX lacks any specific statutory remedies (again as contrasted with *Sea Clammers*

10  and *Smith*) that could serve as evidence of Congress's intent for the statute to provide the exclusive

11  means of relief; and (3) Title IX contains no express private remedy at all, noting that the Supreme

12  Court in *Rancho Palos Verdes* explained that the existence of a private judicial remedy is an important

13  factor to consider when attempting to discern congressional intent.  *Id.* at 686.  The Court found that the

14  fact that the Supreme Court implied a private remedy for Title IX "gives strength to the argument that

15  Congress did not intend for the termination of federal funds-the only remedy explicitly authorized by

16  Title IX-to serve as a comprehensive or exclusive remedy.  Rather, the Supreme Court held that an

17  implied private right of action-in addition to the explicit remedy of termination of federal funds-was

18  necessary to achieve the fundamental purpose of Title IX."  *Id.* at 690 (citations omitted).  The *CFE II*

19  Court thus concluded that the remedies afforded in Title IX are insufficient to preclude the pursuit of a

20  remedy under § 1983.  *Id.*[5]

21      The analysis in *CFE II* applies with equal force here and should be followed.  It is undisputed

22  that Congress did not expressly foreclose a remedy for violation of equal protection when it passed Title

23  IX.  Moreover, even though Defendants utterly fail to meet their burden of demonstrating that Congress

24  implicitly foreclosed Plaintiffs' constitutional equal protection claim, there are several strong indicators

25  that no such foreclosure was intended.

26      First, in addition to those identified by the Court in *CFE II*, it is also notable that when Title IX

27

28  [5]    Much of the reasoning in *CFE II* was first announced in *Lillard*, which *CFE II* concluded
    remained good law after the issuance of *Rancho Palos Verdes*.

1   was passed in 1972, there was little protection against gender discrimination under the Equal Protection

2   Clause because at that time only race and ethnicity received heightened scrutiny.  It was not until the

3   Supreme Court's decision in 1976 in *Craig v. Boren*, 429 U.S. 190, 204-05 (1976) that the Court

4   recognized "sex" as a suspect class entitled to heightened scrutiny.  Thus, when enacting Title IX in

5   1972, Congress could not possibly have considered that it was foreclosing a constitutional right that had

6   been recognized by the Supreme Court.

7   　　　Second, Plaintiffs' equal protection claim is not identical to their Title IX claim for many

8   reasons, including: (1) Title IX covers only entities receiving federal funds, while § 1983 covers all state

9   actors whether or not they receive federal funds; (2) conditions that violate the Constitution may not

10  necessarily violate Title IX.  *See, e.g., Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 732-33

11  (1982) (striking down female-only nursing school policy under Equal Protection Clause and noting that

12  Title IX explicitly allows single-sex admissions policies in certain instances); (3) Section 1983 allows

13  recovery against individuals, *see Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982), while most courts

14  have held that Title IX does not. *See, e.g., Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir.

15  1988) (indicating that damages under Title IX may be available only from educational institutions, not

16  individuals).

17  　　　Third, the Supreme Court has held that an implied right of action exists to enforce Title IX

18  specifically because the statute lacks comprehensive administrative enforcement mechanisms. *Cannon*,

19  441 U.S. 677. While Title IX regulations allow individuals to file complaints with the OCR, 34 C.F.R. §

20  106.71, the process does not, for example, require OCR to address claims, allow complainants to present

21  evidence or witnesses, or require remedies tailored to complainants.  *See id*. at 706 n.41; *Franklin v.

22  Gwinnett County Pub. Schs*., 503 U.S. 60, 76 (1992) (finding private right of action for money damages

23  under Title IX because administrative process would leave complainant "remediless"). Moreover, the

24  Supreme Court has consistently held that an administrative process designed to lead to the withdrawal of

25  federal funds is not the kind of comprehensive enforcement scheme required to subsume § 1983

26  remedies. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 521 (1990); *Wright v. City of Roanoke Redev. &

27  Hous. Auth*., 479 U.S. 418, 428 (1979).  In addition, because Title IX's cause of action is judicially

28  implied, its remedial scheme may be limited by the judiciary. *See Gebser v. Lago Vista Indep. Sch.

1  *Dist.*, 524 U.S. 274, 284 (1998).  Thus, Title IX's remedial framework is not sufficiently comprehensive

2  to warrant § 1983 preclusion.  Plaintiffs may thus properly proceed with their equal protection claim.

3        **D.    The Individual Defendants Are Not Entitled to Qualified Immunity from Plaintiffs'**
4            **§ 1983 Claim for Violation of Their Constitutional Right to Equal Protection.**

5        Defendants' claim of qualified immunity fails because their refusal to provide equal athletic

6  opportunities to women, as alleged in the complaint, violates the well-known and long-established

7  constitutional right to equal protection.  Defendants' contention that they are entitled to qualified

8  immunity based on an analysis of rights under Title IX is fatally flawed.  The right at issue under

9  Plaintiffs' § 1983 claim is whether Defendants violated their constitutional equal protection rights by

10  refusing to provide them with equivalent educational athletic opportunities on the basis of their gender.

11  Plaintiffs' § 1983 claim is thus based on their constitutional right to equal protection, not on Title IX and

12  the three-prong test.[6]  Because the right to equal protection is a well-established and fundamental right, a

13  government official is not entitled to qualified immunity when their conduct violates that right.  *Harlow*,

14  457 U.S. at 819.  Moreover, whether these Defendants reasonably believed their conduct to be lawful is

15  a question of fact not suitable for resolution at the pleadings stage.  The motion to dismiss on this ground

16  should be denied accordingly.

17        The determination of whether qualified immunity protects Defendants from liability requires a

18  two-step inquiry:  first, is the law clearly established and second, could a reasonable official have

19  believed the conduct was lawful under the law.  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir.

20  1993).  Once Plaintiffs establish that the law was clearly established, the burden shifts to Defendants to

21  prove that their conduct was reasonable.  *LSO Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).  In

22  cases, such as this one, where the law is clearly established, "the immunity defense ordinarily should

23  fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*,

24  457 U.S. at 818-19. The court's inquiry may end after a finding that the law is well- established because

25  an official's violation of established law is inherently unreasonable.  *C.N. v. Wolf*, 410 F. Supp. 2d 894,

26

27  [6]    If this Court accepts Defendants' position that the rights at issue are based on a violation of Title
28  IX, Plaintiffs strongly contend that the law is also well-established.  Title IX has existed for over 30
years and numerous well-reasoned cases, including *Cohen II*, 991 F.2d 888, have consistently applied it
to college athletic departments.

1  899 (C.D. Cal. 2005) (ending inquiry after determining that equal protection claim was established law).

2  Here, the Court's inquiry similarly should end upon resolution of the first step. Plaintiffs allege a

3  violation of a well-established constitutional right to equal protection under the law. It is well settled

4  that an institution's refusal to provide equal opportunities to women in athletics violates the equal

5  protection clause. *See, e.g.*, *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982)

6  (inequality in athletics program is a violation of equal protection). Similarly, the constitutional

7  guarantee of equal protection prohibits discrimination on the basis of gender is now firmly settled. *See*

8  *United States v. Va.*, 518 U.S. 515, 539-40 (1996) (exclusion of women from military college is

9  violation of equal protection); *J.E.B. v. Ala. ex rel. T.B.,* 511 U.S. 127, 128 (1994) (gender

10  discrimination in jury selection is violation of equal protection); *Craig*, 429 U.S. at 204-05 (gender

11  discrimination in statute is violation of equal protection). Constitutional rights to equal protection are

12  clearly established rights; thus, "there is no basis for assessing the objective reasonableness of the

13  conduct." *C.N.*, 410 F. Supp. 2d at 899.

14  The second level of inquiry is unnecessary where, as here, a reasonable official could not have

15  been unaware of Plaintiffs' constitutional right to equal protection. Indeed, courts have refused to

16  extend qualified immunity where the law at issue was arguably less established than in this case. For

17  example, in *LSO Ltd.*, 205 F.3d 1146, city officials sought to prevent a private organization from

18  holding an erotic art show on city property. *Id*. at 1150. In the complex legal area of free speech and

19  obscenity, the Ninth Circuit overturned a district court's finding that the free speech right was not

20  clearly established rejecting the court's conclusion that the law was ambiguous. *Id*. at 1157. The *LSO*

21  Court held that the city officials should have understood the previous year's Supreme Court's decision

22  regarding liquor licenses and obscenity laws. *Id*. at 1159. In contrast, here, the right of women athletes

23  to be given equal opportunity to participate and receive financial aid requires no complicated analysis of

24  Supreme Court jurisprudence, nor have there been any recent upheavals in the law.

25  Even if this Court proceeds to the second prong of the analysis, Defendants cannot meet their

26  burden at the pleadings stage to establish that their alleged conduct was reasonable. Defendants' burden

27  of proving reasonableness is high because where the right is a clearly established right, qualified

28  immunity is not appropriate, "no matter how unclear [it is] that the particular action is a violation."

1   *Todd v. U.S.*, 849 F.2d 365, 370 (9th Cir. 1988).  Moreover, the inquiry into the appropriateness of

2   qualified immunity is an objective "fact-specific" test.  *Thorsted v. Kelly*, 858 F.2d 571, 573 (9th Cir.

3   1988).  Often the inquiry is a question of fact, not a matter of law which can be resolved solely on the

4   pleadings.  *Id.* at 575.  Significantly, where a showing of reasonableness requires an inquiry into an

5   official's knowledge or raises a question regarding the facts underlying the claim, the immunity question

6   cannot be resolved at the pleading stage.  *Id.*

7        Here, in order to show reasonableness, Defendants must rely on facts beyond the four-corners of

8   the complaint, such as their subjective knowledge and belief regarding the right to equal protection.

9   Since Defendants must prove that they reasonably believed that the refusal to provide equal athletic

10  opportunities to women complied with Plaintiffs' established constitutional right to equal protection,

11  whether they are entitled to qualified immunity requires resolution of facts not proper at the pleadings

12  stage.  Defendants' motion must fail accordingly.

13      **E.    The Individual Defendants Are Not Entitled to Discretionary Immunity.**

14      Defendants argue that the actions of the individual Defendants in this case involved "a

15  discretionary, as opposed to a ministerial" decision, and that they are, therefore, immune from liability

16  under California Government Code section 820.2.  (Def's MPA at 20:22-24.)  The California Supreme

17  Court has long established, however, that the issue of whether discretionary immunity applies requires

18  an analysis based upon the underlying purpose of immunity, rather than a mechanical or literal approach

19  of determining whether discretion was involved.  *Johnson v. State,* 69 Cal. 2d 782, 795 n.8 (1968).  The

20  California Supreme Court recognized that immunity only applies in a narrow category of cases, "the rule

21  is liability, immunity is the exception."  *Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal. 3d 780, 792 (1985)

22  (citation and internal quotes omitted).

23      The sole purpose of discretionary immunity is to prevent judicial inquiry into sensitive policy

24  decisions of government employees that are best left to agencies other than the courts.  *Johnson,* 69 Cal.

25  2d at 795 n.8.  Thus, immunity applies "only to deliberate and considered policy decisions, in which a

26  conscious balancing of risks and advantages took place."  *Caldwell v. Montoya*, 10 Cal. 4th 972, 981

27  (1995) (citation, internal quotes, alterations, and emphasis omitted).  The decision must have been one

28  made at the planning stage, as immunity does not exist for decisions implementing a policy already in

---

1   place.  *Barner v. Leeds*, 24 Cal. 4th 676, 685 (2000).  It is Defendants' burden to make a showing that a

2   decision was undertaken at the planning level, which consciously and deliberately balanced risks and

3   advantages.  *Johnson*, 69 Cal. 2d at 795 n.8.

4          Additionally, even where a government employee's actions involve complex decisions which

5   require the exercise of skill and judgment, they do not enjoy discretionary immunity unless the actions

6   constitute basic policy decisions rather than the implementation of a basic policy already formulated.

7   *Barner*, 24 Cal. 4th at 685.  In *Barner,* the Supreme Court noted that the scope of the discretionary act

8   immunity "should be no greater than is required to give legislative and executive policymakers sufficient

9   breathing space in which to perform their vital policymaking functions." *Id.* (citations and internal

10  quotes omitted).  Thus, routine duties which are a part of the normal operations of the employee's office

11  or position are not discretionary, while basic policy decisions made at the planning stage of operations

12  qualify employees for immunity.  *Taylor v. City of Los Angeles Dep't of Water & Power*, 144 Cal. App.

13  4th 1216, 1238-39 (2006).

14         Defendants have not shown here that they are entitled to immunity as a matter of law for the acts

15  alleged here. [7]  As support for their argument Defendants offer only the allegations in the complaint

16  which reference the individual Defendants' knowledge that they were acting to implement UCD policy

17  and their involvement in implementing such policy.  (Def's MPA at 20-21.)  The complaint does not

18  allege that Defendants were responsible for creating or structuring UCD policy.  The complaint merely

19  alleges that Defendants acted within their respective roles to carry out UCD policy.  Their involvement

20  in the implementation of policy does not equate to planning or creating a policy.  Defendants cannot

21  point to an allegation that they planned the underlying policy decision.  Nor is there any allegation that

22  Defendants' engaged in discretionary decision making.  In fact, the complaint does not address the

23  creation of UCD's policy regarding Title IX, rather it alleges Defendants' operational acts to implement

24  that policy.  (Compl. ¶ 17.)  Thus, Defendants' reliance on Plaintiffs' allegations that they knew and

25  understood their decisions does not give rise to immunity.  *See McQuirk v. Donnelley*, 189 F.3d 793,

26

27  _____
    [7]     Defendants' contention that Plaintiffs' position on the issue of whether discretionary immunity
    applied here conflicts with the causation element of their liability claim mixes apples and oranges.
28  Plaintiffs do not contend that the individual took no acts that subject them to liability, only that the acts
    alleged, by their nature, are not entitled to discretionary immunity.

799 (9th Cir. 1999); *Neary v. Regents of the Univ. of Cal.*, 185 Cal. App. 3d 1136, 1142 (1986).

Similarly, even where discretion, as that term is commonly used, is actually exercised, immunity under section 820.2 does not apply unless such discretion in exercised in the context of a basic policy decision. *Barner,* 24 Cal. 4th at 685. Defendants' actions were operational decisions, not part of the Regents' "basic policy decisions" made at the "planning" stage. They did not entail "quasi-legislative" determinations of any kind. Accordingly, holding the individual defendants accountable for their tortious actions would not involve the type of judicial oversight that the Legislature feared in enacting section 820.2.

Defendants' reliance on *Caldwell v. Montoya*, *supra,* is misplaced. The court extended immunity to the personnel decision at issue in that case as a matter of law because the application of immunity to such decisions was compelled by California Supreme Court precedent. In *Lipman v. Brisbane Elementary Sch. Dist.,* 55 Cal. 2d 224 (1961), the Court held that a personnel decision by a school board was entitled to immunity because of the "vital public interest in securing free and independent judgment of school trustees in dealing with personnel problems." *Id.* at 230.

No such precedent or public policy compels the application of immunity to the alleged discriminatory treatment of students, much less at the pleadings stage. Rather, courts have declined to extend immunity under such circumstances. In *C.N. v. Wolf*, 410 F. Supp. 2d at 902-03, a high school student brought suit against the school district and its officials under state and federal civil rights laws claiming discrimination based on her sexual orientation. *Id.* at 900. Although defendants claimed that they were entitled to discretionary immunity for their acts, the Court declined to extend immunity at the pleading stage where the alleged misconduct did not implicate the fundamental policy decision at issue in *Caldwell. Id.* at 903. Similarly, the Court should decline to extend immunity to Defendants' acts here, especially at the pleading stage.

For all of the foregoing reasons, the Court should not grant defendants immunity for the acts alleged here.

## F.    Plaintiffs Have Properly Pled a Violation of California Public Policy.

Defendants' piecemeal attack of Plaintiffs' Fourth Claim for Relief, which alleges that Defendants' discriminatory treatment violates several California state law statutes and the California

1    Constitution that prohibit sex discrimination in education in this state, is insufficient to defeat this cause

2    of action.  In order to bring a tort for violation of public policy, Plaintiffs' must plead allegations to

3    satisfy the following requirements:  First, the policy must be supported by either constitutional or

4    statutory provisions.  Second, the policy must be "public" in the sense that it "inures to the benefit of the

5    public" rather than serving merely the interests of the individual.  Third, the policy must have been

6    articulated at the time of the discharge.  Fourth, the policy must be "fundamental" and "substantial."

7    *Stevenson v. Super. Ct.*, 16 Cal. 4th 880, 890 (1997).

8         Plaintiffs' complaint provides two sources of public policy – California Constitution and

9    Education Code – and both of these sources meets the prerequisites set forth above.  As to each,

10   Plaintiffs make the necessary allegations.  (*See* Compl. 74, 78-79.)  These statutes clearly establish the

11   substantial public policy against gender discrimination.

12        Defendants' suggestion that the claim is exclusive to employment law is incorrect.  Courts have

13   consistently upheld tort claims based on California's public policy against discrimination.  *See, e.g.,*

14   *Stevenson*, 16 Cal. 4th at 895 (Fair Employment and Housing Act declares a fundamental public policy

15   against age discrimination); *Rojo v. Kliger*, 52 Cal. 3d 65, 90 (1990) (California Constitution (Art. 1, §

16   8) declares a fundamental public policy against sex discrimination).  It is not the specific statute or

17   regulation that forms the basis for the tort, but the underlying policy reflected in it.  *Green v. Ralee*

18   *Eng'g Co.*, 19 Cal. 4th 66, 79 (1998).   Significantly, it is the relationship and duty upon which the tort is

19   based which gives rise to the right to recover.  *See Johns-Manville Sales Corp. v. United States*, 622 F.

20   Supp 443, 449 (N.D. Cal. 1985) (where no California tort principles neatly fit the case, but the

21   government acted against public policy, the court found a tort action alleged).

22        Defendants contention that this entire claim must be dismissed because the statutes relied on do

23   not authorize a private right of action is misdirected and irrelevant.  Plaintiffs do not bring any

24   independent cause of action under a Constitutional or statutory provision requiring a private right of

25   action; rather, they have plead a tort claim which includes a private right of action.  Further, the

26   California Education Code sections 220 *et seq.* and 262.4  explicitly states that sections 200, 201, and

27   220 may be enforced through a civil action.  Cal. Educ. Code § 262.4.  The right to proceed against

28   individual defendants for violations of these statutes is well-settled.  *C.N.,* 410 F.Supp.2d at 904.  These

statutory provisions alone defeat Defendants' challenge to this claim.[8]

Defendants' challenge to Plaintiffs' claim in its reliance on the Constitution and other provisions of the Education Code is equally unavailing where Plaintiffs assert a public policy tort claim. Even if a statute does not authorize expressly an independent private right of action, when a legislative provision embodying a public policy is enacted for the protection of a particular class of persons, as is the case here, its violation may give rise to civil liability to an injured plaintiff who is a member of the class. *Hudson v. Craft*, 33 Cal. 2d 654, 659 (1949). Because Plaintiffs' public policy claim tort claim does not depend upon a showing that the Constitutional and statutory provisions from which the public policy emanates also authorize a private right of action, Defendants' challenge to this cause of action fails.

Additionally, relying principally on *Reynolds v. Bement*, 36 Cal. 4th 1075 (2005), Defendants argue that, even where a private right of action is authorized, there still remains a question of whether the individual Defendants can be held liable for damages. Defendants' argument is flawed, however, because Plaintiffs' claim for violation of public policy is a tort claim, based upon the important public policy, against discrimination in education. Accordingly, the question is not whether there is a private right of action for violation of a specific statute, but whether the Defendants engaged in tortious conduct in violation of public policy.

Moreover, unlike the Defendants here, the individual defendants in *Reynolds* against whom the plaintiffs sought liability had not engaged in any actions themselves in violation of the statute in question. They were merely officers, directors and shareholders of the corporate employer. The Court acknowledged that "directors may be 'jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct.'" *Reynolds*, 36 Cal. 4th at 1089-90. Here, the individual defendants are not merely officers or agents of the Regents but are individuals who were directly involved in and participated in the conduct which constituted the violation of public policy. Similarly, *Thornburg v. Superior Court*, 138 Cal. App. 4th 43 (2006) does not support Defendants' position because that case sought to establish statutory liability, not tort liability.

---

[8]     If the Court is inclined to dismiss Plaintiffs' public policy tort claim on any grounds, Plaintiffs request leave to amend to allege violations of these Education Code provisions as independent statutory claims.

23

Defendants' thus provide no case law that supports the proposition that the individual Defendants cannot be held liable for damages.  Therefore, the individual Defendants are not immune from any liability, including damages.

**IV.    CONCLUSION**

For the forgoing reasons, the Court must deny Defendants' Motion to Dismiss.

DATED:  November 30, 2007                    Respectfully Submitted,

THE STURDEVANT LAW FIRM
A Professional Corporation


By:    /s/   Monique Olivier
MONIQUE OLIVIER
Attorneys for Plaintiffs


Z:\428_Brust v UC Regents\Pleadings\Opp to Rule 12(b)(6) Motion - MPA.doc